**Sol ZELLER, Plaintiff,**

v.

**UNITED STATES of America, Interstate Commerce Commission, Marvin Kampel, George Stafford, and Daniel LoRusso, Defendants.**

No. 76 C 508.

United States District Court, E. D. New York.

March 21, 1979.

12. The court expects that amici will be allowed full participation in all negotiations among the parties.

Harry E. Youtt, Thal & Youtt, New York City, for plaintiff.

Richard P. Caro, Asst. U. S. Atty., Brooklyn, N. Y., Edward R. Korman, U. S. Atty., Eastern District of New York, Brooklyn, N. Y., for defendants.

GEORGE C. PRATT, District Judge:

This lawsuit, seeking damages and injunctive relief under various federal statutes and pendent state claims, presents several questions of law, the most important ones involving interpretation of the federal Freedom of Information Act and the federal Privacy Act. Defendants move for dismissal, partly for judgment on the pleadings pursuant to FRCP 12(c), and partly for summary judgment pursuant to FRCP 56(b). Papers filed with the court for consideration on the motion include statements pursuant to Eastern District Rule 9(g), affi-

davits of counsel and parties, Interstate Commerce Commission files and records pertaining to plaintiff, and extensive memoranda of law.

Although the major issues involve solely questions of law, the undisputed factual and procedural context in which they arise provides a necessary perspective from which to approach them.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 1970 and 1971, plaintiff Sol Zeller was engaged in the business of brokering charter bus tours for individuals and groups in the New York-Long Island area, usually for vacation, sight-seeing, or educational purposes. Doing business under the names "Sol Zeller Tours" and "Executive Motor Tours", plaintiff acted as a broker between clients seeking transportation and available charter bus companies. Zeller did not possess the broker's license from the Interstate Commerce Commission (ICC) that is required of individuals who, for compensation, arrange for interstate transportation of passengers or property. See Part II, § 211(a) of the Interstate Commerce Act, 49 U.S.C. § 311(a).[1]

In 1970, Zeller arranged a charter bus tour for the Hillel Country Day School of Lawrence, New York. Planned as a one-day interstate excursion on July 15, 1970, from Lawrence, on Long Island, to Lancaster, Hershey and York, Pennsylvania, with a return to Lawrence, the trip ended in a tragic highway accident near Allentown, Pennsylvania, that killed seven children who were passengers on the chartered bus, and injured many others.[2]

In August, 1971, the ICC commenced a civil action in the United States District Court for the Eastern District of New

---

1. Zeller had twice attempted unsuccessfully to obtain such a broker's license, in 1967 and 1968. Aff. of Sol Zeller, ¶ 4.

2. The bus apparently skidded on a wet road surface, broke through a guard rail and rolled down an embankment. Zeller, who was accompanying the group, was among those in-

jured. See Highway Accident Report No. NTSB–HAR–71–8, National Transportation Safety Board, September 8, 1971, Ex. D to Defendants' Memorandum of Law in Support of Motion to Dismiss and for Summary Judgment.

York,[3] pursuant to the Interstate Commerce Act, 49 U.S.C. § 311(a) & (c), and § 322(b)(1), seeking to restrain Zeller, doing business as Sol Zeller Tours and Executive Motor Tours, from continuing to

broker the transportation of passengers by motor vehicle for compensation in interstate or foreign commerce * * * without first having obtained * * * a broker's license authorizing such transactions * * * as required by * * * the Interstate Commerce Act. See Exhibit A to Defendants' Memorandum of Law in Support of Motion to Dismiss and for Summary Judgment, Civil Action No. 71 C 1037, Complaint at 3.

An appendix to that complaint listed transactions alleged to be representative instances of plaintiff's unlawful arrangement of transportation. Among those listed was the ill-fated July 15, 1970 Hillel Country Day School trip.

Zeller's answer to that complaint denied that any of the transactions listed in the appendix had been arranged in violation of law; in response to requests for admission, Zeller denied the receipt of compensation for the transportation listed. Nevertheless, the case was concluded on June 12, 1972, after Zeller consented to "Findings of Fact and Conclusions of Law" signed by the late Judge Judd, in which it was found that

on various dates and on numerous occasions between March 6, 1970, and the date of the filing of the complaint in said action, said defendant for compensation as a broker sold and offered for sale transportation subject to * * * the Interstate Commerce Act * * * and held himself out by advertisement * * as a person who * * * arranges for such transportation * * *. Exhibit A to Defendants' Memorandum, Findings of Fact and Conclusions of Law at 2, June 12, 1972.

The court also found that Zeller had arranged for such transportation on "some of the dates specified in [the appendix] attached and made a part of the complaint * * *." Id. at 3.

On the same day, Judge Judd granted judgment enjoining Zeller from independently brokering motor transportation for compensation in interstate or foreign commerce, and from holding himself out to broker such transportation, without first obtaining a broker's license from the ICC. The judgment was consented to by Zeller personally and by his counsel. See Exhibit A to Defendants' Memorandum.

On the following day, June 13, 1972, the ICC regional office in Boston, Massachusetts, disseminated to various newspapers and trade publications as well as to other ICC regional offices, a press release describing the consent judgment and the fact that Zeller had been enjoined from independently brokering motor transportation for compensation in interstate commerce without first obtaining a broker's license from the ICC. The press release read as follows:

For Release: IMMEDIATE                                      June 13, 1972

COURT ACTION:            INTERSTATE COMMERCE COMMISSION
                                              v.
                              SOL ZELLER, doing business as SOL ZEL-
                              LER TOURS and EXECUTIVE MOTOR
                              TOURS

In the United States District Court for the Eastern District of New York—Honorable Orrin G. Judd, Judge.

On June 12, 1972 at Brooklyn, New York, judgment was entered permanently enjoining the defendant Sol Zeller, doing business as Sol Zeller Tours and Executive Motor Tours, Brooklyn, New York, from brokering motor transportation for compensation in interstate or foreign

3. *Interstate Commerce Commission v. Sol Zeller d/b/a Sol Zeller Tours and Executive Motor Tours*, No. 71 C 1037 (EDNY).

commerce, or holding himself out to broker such transportation, without first obtaining a broker's license from the Interstate Commerce Commission.

The complaint filed in this case alleged that the defendant, a passenger broker who held and holds no broker's license from the Interstate Commerce Commission, had in violation of the Interstate Commerce Act for compensation arranged for and sold the interstate transportation by motor bus of various groups, including the transportation of children from the Hillel Country Day School, Lawrence, Long Island, New York to Lancaster, Hershey and York, Pennsylvania which prematurely ended in a fatal accident on July 15, 1970 near Allentown, Pennsylvania in which seven of the children were killed. The charter bus operator involved in that charter trip, Tedesco Bus Co., Inc., had previously on October 1, 1971 been fined $3,000 for violations of the Interstate Commerce Act in the United States District Court for the District of New Jersey as a result of a criminal action instituted at the instance of the Interstate Commerce Commission.

The instant case was instituted and presented to the court by the Commission's Bureau of Enforcement upon information furnished by the Bureau of Operations. (Refer E 2–71–19).

Over a year later, in late 1973, defendant Marvin Kampel, who was employed by the ICC as a district supervisor in the New York area, was instructed by his superiors to investigate whether Zeller was violating the Interstate Commerce Act or was operating in violation of the 1972 injunction.[4] His investigation was conducted during 1974 and 1975, and included field interviews with known or possible customers of Zeller. On at least one occasion, Kampel gave a

copy of the June 13, 1972 press release to the person being interviewed. Kampel Aff., ¶ 6.

In addition to the investigation, Kampel also at times assisted prospective applicants for brokers' licenses who visited the ICC offices in New York. On at least six occasions he distributed copies of the press release to such individuals in order to demonstrate the consequences of operating without a broker's license. Kampel Aff. ¶ 7. Kampel had no part, however, in the preparation and initial distribution of the press release.

By letter dated April 13, 1975, addressed to the Secretary of the ICC, Zeller contested the wording of the 1972 press release on the ground that it contained statements and implications that were inaccurate, misleading, and prejudicial. He asserted that much of the language in the press release had been taken out of context; that the press release incorrectly raised implications connecting Zeller's violation of the Interstate Commerce Act with the bus accident near Allentown; that the press release prejudiced him by associating him with the carrier on the bus trip and by stating that the carrier had been fined in a previous criminal proceeding; and finally, that the press release failed to indicate that the consent judgment did not prevent him from acting as an agent for a broker or being otherwise employed by a broker. Zeller requested that appropriate corrections be made, and demanded access to the complete ICC file and all ICC records and documents pertaining to him. See Rec. at 51–53.[5]

The ICC responded that it considered the press release to be factually correct. It construed plaintiff's April 13, 1975 request as having been made pursuant to the Freedom of Information Act, 5 U.S.C. § 552

4. Kampel was charged with the administration of various regulations established by the ICC with jurisdiction that included Kings and Bronx counties, New York. He also carried out certain office duties at the ICC offices at 26 Federal Plaza, New York. Aff. of Marvin Kampel, ¶¶ 2, 7.

5. References to "Rec." are to an unnumbered exhibit binder submitted by defendants in support of their motion; the binder contains what is asserted to be a complete copy of the ICC files, including all correspondence, maintained on Zeller in any capacity, together with a separate envelope of documents which were not disclosed to him, but were provided to the court for in camera inspection.

(FOIA), and advised him that he was entitled to examine approximately 108 pages of material; he was denied access to other ICC records relating to him on the ground that they fell into several exemptions contained in that statute. Letter dated May 12, 1975, addressed to plaintiff from Acting Secretary of ICC, Rec. at 47–48. Certain records were withheld on the ground that they were wholly or partially exempt as intra-agency memoranda, FOIA(b)(5);[6] other documents were considered investigatory records exempt on the ground that their production would "constitute an unwarranted invasion of personal privacy", FOIA(b)(7)(C); still other investigatory records were withheld on the ground that they were compiled for law enforcement purposes, and their production would "interfere with enforcement proceedings", FOIA(b)(7)(A).

Plaintiff subsequently requested, on July 21, 1975 and on August 11, 1975, that his April 13, 1975 letter be considered as an initial request under the Privacy Act of 1974, 5 U.S.C. § 552a (PA). Rec. at 39, 41. The ICC questioned this in view of the fact that the PA would not become effective until September 27, 1975, and requested clarification from Zeller as to which statute, PA or FOIA, his request was based upon. Rec. at 38.

Zeller thereupon retained counsel who wrote to the ICC on October 16, 1975, specifying that plaintiff sought relief under both the FOIA and the PA, and asking that the letter be considered an initial request under the PA. Rec. at 30–37. Counsel also restated plaintiff's earlier objections to the press release regarding alleged inaccuracies and implications, and demanded revision of the press release or amendment of the ICC records. The letter made other miscellaneous requests under various provisions of the PA: an accounting of each ICC disclosure of the press release, a copy of the ICC procedures concerning access to and review

and amendment of records, and notice by the ICC to all individuals to whom the press release had been distributed advising them of any corrections or disputed sections.

The secretary of the ICC responded by letter dated December 24, 1975, advising Zeller's counsel that the ICC records contained no personal information concerning Zeller, but rather, information regarding Zeller's entrepreneurial activities, and that in accordance with Office of Management and Budget (OMB) Guidelines the secretary, therefore, considered such information not subject to the PA. See 40 Fed.Reg. 28948 (1975).

Zeller's counsel appealed the secretary's denial to the chairman of the ICC, who subsequently affirmed the secretary's decision by letter dated January 30, 1976, stating that "the information sought is entrepreneurial in nature and that therefore, [plaintiff's] request does not fall within the ambit of the Privacy Act." Rec. at 14. In addition, the chairman advised that dissemination of the press release would cease, and along with the letter, enclosed 107 pages of information pursuant to plaintiff's FOIA request.

## II. NATURE OF THE PRESENT ACTION

Plaintiff filed the complaint in this action on March 15, 1976, seeking damages and injunctive relief against the government, the ICC, Kampel, Kampel's superior, Daniel LoRusso, and ICC Chairman, George Stafford. Originally there were seven causes of action; two more were added by amendment on April 30, 1976.

Plaintiff's complaint presents claims under the PA, the FOIA, and the Federal Tort Claims Act, as well as pendent state law claims of libel, slander and *prima facie* tort. Under the PA plaintiff seeks in Count I injunctive relief pursuant to PA(e)(5) & PA(e)(6)[7] to restrain further dissemination

---

6. To simplify citations 5 U.S.C. § 552 will be omitted from some references to the Freedom of Information Act, so that the reference will read simply, as above, FOIA(b)(5).

7. To simplify citations 5 U.S.C. § 552a will be omitted from some references to the Privacy Act, so that the reference will read simply, as above, PA(e)(5).

of the press release and to compel the ICC to amend it so as to render it "accurate, complete, timely and relevant within the meaning of the Privacy Act * * * ", as well as damages, pursuant to PA(g)(1), PA(g)(2)(A) & PA(g)(4), for defendants' alleged wrongful dissemination of the press release and for failure to maintain records as mandated by PA(e)(5). In seeking this relief, plaintiff invokes PA(g)(2)(A), which authorizes *de novo* review of the challenged agency determination.

In Count II plaintiff seeks equitable relief under the FOIA and the PA to obtain disclosure of all files and records in possession of the ICC that are pertinent to him.

Miscellaneous injunctive relief under the PA is sought in Count III. Under the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671 *et seq.*, (FTCA)[8] plaintiff seeks damages against the United States for the disclosures by its employee Kampel, and for the ICC's negligent failure to supervise Kampel and prevent his disclosures of the press release, allegedly in violation of PA(b).[9] Amendment to Complaint, Counts VIII & IX.

Based upon still other statutory provisions, plaintiff seeks in Count VII mandamus relief under 28 U.S.C. § 1361 compelling the individually named defendants to perform their statutory duties under the PA by preventing unauthorized issuance or disclosure of the press release, and in Count V, actual damages for wrongful disclosure of information by an ICC agent in violation of 49 U.S.C. § 322(d); plaintiff has indicated his intent to abandon the latter claim. See n. 9, *supra*.

Finally, as to the pendent state law claims, plaintiff seeks damages from Kampel for libel and slander, based upon Kampel's distribution of the press release and defamatory oral statements which he allegedly made, Count IV, and for *prima facie* tort, claiming that Kampel's actions amounted to an intentional effort to destroy plaintiff's name and business reputation. Count VI.

## III. PRIVACY ACT: DEFENDANTS' THRESHOLD ARGUMENTS

Before addressing plaintiff's claims on the merits, defendants raise three preliminary arguments as to the scope of the PA itself and the permissible extent of the court's review of the particular decision made by the ICC here. Defendants argue that the only determination they have made thus far under the PA was that the information Zeller requested was "entrepreneurial" and, therefore, did not fall within the scope of the PA. Review of that initial decision, defendants urge, should be made under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* (APA), and, if found to be erroneous, should result only in a remand to the ICC so that Zeller's requests can be decided by defendants on their merits. Three threshold questions are thus presented: whether review in this action is under the APA or the PA, whether "entrepreneurial" information falls within the PA, and whether remand is appropriate.

### A. *Review here is under the PA, not the APA.*

Defendants assert that the court is limited in this action to a review of the ICC chairman's determination that the Privacy Act does not apply to the information sought by this plaintiff; they argue that

---

8. Before a court action may commence under the FTCA, a claimant must first present his claim or claims to the appropriate federal agency, 28 U.S.C. § 2675(a). By letter dated March 15, 1976, plaintiff's counsel presented this claim to the ICC which finally denied the claim by letter dated March 26, 1976. Rec. at 11–13. Plaintiff filed this court action on the same day the claim was first presented to the ICC, rather than waiting for an ICC denial. Two amendments to the complaint, alleging claims under the FTCA, were filed on April 30, 1976. De-

fendants have, nonetheless, questioned the court's jurisdiction over plaintiff's FTCA claims, due to the plaintiff's failure to plead that administrative proceedings had been exhausted. This issue is dealt with in Part VI, *infra*.

9. Plaintiff has abandoned similar claims asserted originally under 49 U.S.C. § 322(d). See Defendants' Memorandum of Law filed April 11, 1977, at 2, 58n.

such review must be pursuant to the APA, which, if applicable would require the court to determine only whether the ICC chairman's determination was arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law. 5 U.S.C. § 706. Defendants' position would limit the court at this stage merely to review of the determination that the PA is inapplicable in its entirety, and would exclude from such review any possible substantive violations or misapplications of the Act.

■ From the terms of the PA and its somewhat sparse legislative history, the court concludes that Congress intended that the PA provide a more extensive judicial review over agency actions than that permitted under the APA. PA procedures are set forth in PA(g), which states in relevant part:

(g)(1) *Civil remedies. Whenever any agency*

(A) *makes a determination* under subsection (d)(3) of this section not to amend an individual's record in accordance with his request, or fails to make such review in conformity with that subsection;

(B) *refuses to comply* with an individual request under subsection (d)(1) of this section;

(C) *fails to maintain* any record concerning any individual with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to the individual that may be made on the basis of such record, and consequently a determination is made which is adverse to the individual; *or*

(D) *fails to comply* with any other provision of this section, or any rule promulgated thereunder, in such a way

as to have an adverse effect on an individual,

*the individual may bring a civil action* against the agency, and the district courts of the United States shall have jurisdiction in the matters under the provisions of this subsection. (emphasis supplied).

The Senate bill, S. 3418, modified as the compromise bill, was enacted into law as the Privacy Act. After stating the purposes of its bill, the Senate Report pointed out several ways in which the Act accomplishes those purposes,[10] one such method being that

Judicial remedies allow the enforcement of the Act through the courts by individuals and organizations in civil actions challenging denial of access to personal information or through suits by * * * any aggrieved person to enjoin violations or threatened violations of the Act. Sen. Rep.No.93–1183, 93rd Cong.2d Sess., (1974) *reprinted in* [1974] U.S.Code, Cong. & Admin.News, 6916 at 6918.

Under the Act, an "individual" may bring a civil action against an agency whenever the agency "makes a determination * * not to amend an individual's record in accordance with his request", PA(g)(1)(A), "refuses to comply with an individual request", PA(g)(1)(B), "to gain access to his record or to any information pertaining to him which is contained in the system", PA(d)(1). In this connection the Senate Report states that

The Committee intends that any citizen who is denied a right of access under the act may have a cause of action * * *. In order to state a cause of action, it should be enough that he be able to assert that *the presumptive right of access* granted him by the Act *has been denied him. Id.,* [1974] U.S.Code, Cong. & Admin.News at 6996 (emphasis supplied).

---

10. These purposes, at least as viewed by the Senate, included *inter alia,* the promotion of governmental respect for the privacy of citizens by requiring all departments and agencies of the executive branch and their employees to observe certain constitutional rules in the computerization, collection, management, use, and disclosure of personal information about the individuals. Sen.Rep. No.93–1183, 93rd Cong.2d Sess., *reprinted in* [1974] U.S.Code Cong. & Admin.News, p. 6916.

Here, Zeller, who is an "individual" within the meaning of PA(a)(2), made several requests of the type authorized under the Act. Their denial by the ICC secretary was affirmed by the ICC chairman, whose final determination is a sufficient predicate for Zeller's pursuit of the various civil remedies authorized in PA(g). Nothing in the statute or its legislative history supports the government's suggestion that the type of review must vary, depending on the reasons offered by the agency for denying an individual's requests.

Although it could have done so, Congress did not require that judicial review of an agency determination under the PA be taken pursuant to the APA. Instead, Congress provided by an explicit statutory scheme for broader, more direct judicial action. Having requested and been denied relief specifically described in the Act, plaintiff may now pursue the judicial remedies authorized under PA(g).

B. *"Entrepreneurial" information is not excluded from the impact of the Privacy Act.*

Defendants' principal argument is that the PA does not apply to information that relates to an individual in his entrepreneurial or proprietary capacity. In support of their argument they cite the statute, the implementing guidelines and regulations, and the legislative history. Zeller disagrees, of course. He argues that the PA protects him as an individual, and extends to all information which can be retrieved from the ICC files using his name as the identifier.

Generally speaking, the Privacy Act applies to a "system of records" in which information on an "individual" is maintained by a federal agency. PA(b) forbids disclosure of any records contained in a system of records without the written request or prior written consent of the individual to whom the record pertains; PA(c) requires that an agency maintaining a system of records also keep an accurate accounting of each disclosure, with certain exceptions: PA(d)(1) permits (with one ex-

ception described in PA(d)(5)) an individual to gain access to "his" record and to any information pertaining to him which is contained in the "system"; PA(d)(2) permits an individual to seek amendment of records alleged to be inaccurate; and PA(d)(3) permits the filing of a notice of dispute as to any record which the agency refuses to amend.

Before the agency and in the present action, plaintiff has stressed the PA's definitions of "record" and "system of records" in support of his proposition that when information about an individual is contained in a record, the PA is applicable whether or not such information is personal or entrepreneurial in nature.

The term "record" is defined in PA(a)(4):

(4) the term "record" means any item, collection, or grouping of information about an individual that is maintained by an agency, including, but not limited to, his education, financial transactions, medical history, and criminal or employment history and that contains his name, or the identifying number, symbol or other identifying particular assigned to the individual, such as a finger or voice print or a photograph.

The term "system of records" is defined in PA(a)(5):

(5) the term "system of records" means a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual;

Defendants rely on the term "individual" and its legislative history as being pivotal on the entrepreneurial issue. Individual is defined in PA(a)(2) as

a citizen of the United States or an alien lawfully admitted for permanent residence.

Discussing that term, the Senate Report stated:

[T]he term "individual" means a citizen of the United States or an alien lawfully admitted to permanent residence. The

term is used instead of the term "person" throughout the bill in order to distinguish between the rights which are given to the citizen as an individual under this Act and the rights of proprietorships, businesses and corporations which are not intended to be covered by this Act. This distinction was to insure that the bill leaves untouched the Federal Government's information activities for such purposes as economic regulations. Sen. Rep.93–1183, 93rd Cong., 2nd Sess. 79 (1974), *reprinted in* [1974] U.S.Code, Cong. & Admin.News at 6993.

Thus, defendants argue, the legislative history expressly distinguishes between personal information contained in agency files and information pertaining to an individual acting in his entrepreneurial, proprietary or business capacity.

Defendants draw additional support from the guidelines promulgated by the Office of Management and Budget (OMB) pursuant to statutory mandate to assist federal agencies in implementing the Privacy Act.[11] With regard to interpretation of the term "individual", the OMB guidelines rely upon the statutory language and legislative history cited above, and state that a

> \* \* \* distinction can be made between individuals acting in a personal capacity and individuals acting in an entrepreneu-

rial capacity (*e. g.,* as sole proprietors) and that this definition, (and, therefore, the Act) was intended to embrace only the former. This distinction is, of course, crucial to the application of the Act since the Act, for the most part, addresses "records" which are defined as " \* \* \* information about individuals" (subsection (a)(4)). Agencies should examine the contents of the records in question to determine whether the information being maintained is, in fact, personal in nature. A secondary criterion in deciding whether the subject of an agency file is, for purposes of the Act, an individual, is the manner in which the information is used; *i. e.,* is the subject dealt with in a personal or entrepreneurial role. 40 Fed.Reg. 28948, 28951 (1975).

Of course, OMB's guidelines do not bind this court.[12] Moreover, they are designed merely to assist federal agencies and not to bind them in their interpretation and application of the Act. Indeed, when the ICC issued its own regulations, 49 CFR § 1007, its definitions made no mention of "entrepreneurial" information; they merely tracked the language of the statute.[13] The ICC regulations state that

> any individual may request information on whether a system of records main-

---

**11.** Section 6 of the Privacy Act provides that
The Office of Management and Budget shall—
> (1) develop guidelines and regulations for the use of agencies in implementing the provisions of section 552a of title 5, United States Code, as added by section 3 of this Act; and
> (2) provide continuing assistance to and oversight of the implementation of the provisions of such section by agencies. Pub.L.93–579, § 6, 88 Stat. 1905.

Pursuant to this mandate the OMB published guidelines for Privacy Act implementation. 40 Fed.Reg. 28948 (1975).

**12.** *Cf. United States v. Consumer Life Ins. Co.,* 430 U.S. 725, 97 S.Ct. 1440, 1454, 52 L.Ed.2d 4 (1977) (construction of a statute "by the agency charged with its enforcement is entitled to great deference by the courts"); *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 381, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969) ("the construction of a statute by those charged with its execution should be followed unless there are

compelling indications that it is wrong \* \*."). Note, however, that the court is not required to give effect to an interpretative regulation; varying degrees of deference are accorded to administrative interpretations, based on such factors as the timing of the agency's position and the nature of its expertise. *See Batterton v. Francis,* 432 U.S. 416, 425, n. 9, 97 S.Ct. 2399, 53 L.Ed.2d 448 (1977); *General Electric Co. v. Gilbert,* 429 U.S. 125, 141–145, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976); *Morton v. Ruiz,* 415 U.S. 199, 231–237, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974).

**13.** Compare the relevant regulation promulgated by the Small Business Administration:
> (c) "Individual" means a citizen of the United States or an alien lawfully admitted for permanent residence. *This term shall not encompass entrepreneurial enterprises (e. g.,* sole proprietors, partnerships, corporations, or other forms of business entities). 13 CFR § 102.21(c) (emphasis supplied.)

tained by the Commission contains *any information* pertaining to him or her, or may request access to his or her record or to *any information* pertaining to him or her which is contained in a system of records. 49 CFR § 1007.3(a) (emphasis supplied).

Thus, although the OMB guidelines expressly distinguish between an individual in his personal capacity and an individual in his entrepreneurial or business capacity, in its own regulations the ICC did not set forth such a distinction.

█ In applying the Privacy Act here, the court must ascertain and give effect to the congressional intent. *Philbrook v. Glodgett,* 421 U.S. 707, 95 S.Ct. 1893, 44 L.Ed.2d 525 (1975). One factor to be considered in the "search for legislative purpose" is the history of the statutory language as it finally evolved. *Israel-British Bank (London), Ltd. v. FDIC,* 536 F.2d 509, 512 (C.A.2 1976).

Separate privacy bills were passed by both houses of Congress on November 21, 1974. The major differences between the Senate version, S. 1348, and the House version, H.R. 16373, were whether there should be a privacy board as opposed to a privacy study commission, and certain differences in provisions dealing with law enforcement agencies. All those involved in the legislative process including the Administration, agreed on the need for enactment of some sort of privacy legislation before the congressional recess. 120 Cong.Rec. 40880 (Dec. 18, 1974) (Remarks of Congressman Moorehead). In order to accelerate the legislative process, the usual procedure of submitting conflicting bills to a conference committee was omitted; instead, the bills were studied by the respective committee staffs, by whom amendments for a compromise bill were then drafted.[14] Thus there was no conference committee report. A staff-prepared memorandum detailing the views of four legislators and their staff members was the only subsequent documentation of the Privacy Act's legislative history. See Analysis of House and Senate Amendments to the Federal Privacy Act, 120 Cong.Rec. 40405 (Dec. 17, 1974).

The original Senate version of S. 3418 had used the term "personal information" throughout; but the term was defined to mean

* * * *any information* about the individual that identifies or describes any characteristic including but not limited to education, financial transactions, medical history, criminal or employment record * * *. Sen.Rep.93–1183, 93rd Cong., 2d Sess. 79 *reprinted in* [1974] U.S.Code Cong. & Admin.News at 6992 (emphasis supplied).

See also 120 Cong.Rec. 40408 (Dec. 17, 1974).

█ Even had it continued into the final enactment, the term "personal information" as thus defined would be a weak peg on which to hang such an extensive and fundamental exclusion from this remedial statute as "all entrepreneurial or proprietary infor-

14. See remarks of Senator Ervin, the prime mover of the privacy legislation in the Senate:

On November 21 * * * both the Senate and the House passed in different forms Federal privacy legislation. Because of the limited amount of time available between the time of the reconvening of Congress after the [Thanksgiving] recess and the end of the session of Congress, members of the Government Operations Committee[s] of the Senate and the House agreed that they would have the different version studied by their respective staffs during the recess.

After the recess the members of the staffs who had made this study reported to the members of the two committees, and after that the members of the two committees met informally and agreed on the amendments [for the compromise bill, S.3418] * * *. 120 Cong.Rec. 40400 (Dec. 17, 1974)

See also remarks of Congressman Moorehead, the prime mover of the privacy legislation in the House:

Because of the lateness in the session and the pressures on Members of both bodies due to other pressing legislative business, we determined that it would not be possible to resolve the complex differences between the two bills in a conference committee. Yet, the sponsors and floor managers of the legislation on both sides firmly agreed that it was imperative that final action be taken on privacy legislation before the end of the Congress. 120 Cong.Rec. H. 12242 at 12243 (daily ed. Dec. 18, 1974).

mation". The peg is weaker yet, however, because in the final version the term "personal" survived, as a modifier of the type of information covered by the Privacy Act, only in the statement of purpose and congressional findings. See Pub.L.93–579, § 2(a)(1), (2), 88 Stat. 1896 (Dec. 31, 1974). In all the operative sections of the PA Congress used the terms "information" and "any information", without modification or limitation.

Beyond this, nothing in the statute indicates that Congress intended to apply a personal/entrepreneurial distinction to the type of information covered by the Privacy Act. As noted by Congressman Erlenborn, in his general comments on the earlier House version of the statute:

Under this bill we are allowing any individual access to records that are maintained by the Government relative to himself. In other words, any person, any individual can go to the agency that is subject to this act and say "I want copies of anything you have relating to me." 120 Cong.Rec. 36961 (Nov. 21, 1974).

See also, remarks of Senator Ervin on the remedial nature of the Senate bill with regard to its impact on such "small businessmen" as private attorneys and accountants. 120 Cong.Rec. 36896 (Nov. 21, 1974).

In summary on this point, the statutory language, when viewed in the light of the legislative history and Congress' express findings and statement of purposes, simply does not support the "entrepreneurial" exclusion from the Privacy Act that is embodied in the OMB guidelines and urged by defendants here. Correctly construed, the Privacy Act extends to all information contained within an agency's system of records that pertains to an individual and can be retrieved by the individual's name or by some identifier assigned to him, without regard to the content of the information or whether it pertains to the individual's business activities. The scope of information available under the statute is defined not by the content of the record maintained by the agency, but by the retrieval method used in the agency's system of records.

Accordingly, insofar as defendants' motion seeks to dismiss plaintiff's Privacy Act claims on the ground that the entrepreneurial information sought is not within the scope of the PA, the motion is denied.

C. *Remand to the ICC is not appropriate.*

██ Defendants next urge that if the court should determine that the PA does apply here, then the case should be remanded to the ICC in order to give the agency an opportunity to consider the merits of Zeller's PA requests. They argue that the ICC merely made a threshold determination that the PA was inapplicable to Zeller's entrepreneurial information, and that no administrative record has yet been developed as to the disputed factual matter. Zeller opposes a remand and urges that the statutory language provides an adequate basis for the court's power to fully determine his claims at this time.

Under the "civil remedies" portion of the statute, Congress has provided that whenever an agency refuses one of the requests enumerated, the individual may bring a civil action in the district court. *De novo* review is required when the agency has refused to amend an individual's record under PA(d)(3), or refuses to grant an individual's request to gain access to his record under PA(d)(1). Nothing in the statute requires a remand to the agency once the civil action has been commenced. PA(g).

Plaintiff's position rests upon a literal reading of the statute that contemplates court disposition of the problem once the agency has failed to act in a manner required by the PA. In short, plaintiff argues that the court has jurisdiction and should act merely because the agency has failed to comply with his requests under the statutes. He also argues that remand of this case would create a four stage review process in place of the two stage review contemplated by the statute. The government replies that the "entrepreneurial" problem is unusual, and once determined judicially, will not recur, so that no general "four-stage review" is contemplated.

While it is true that no administrative record has been developed, the government has not identified any disputed factual issues on which such a record might be needed. Realistically, the issues presented are essentially legal questions which focus upon interpretation of the statute itself, particularly its definitions. The agency's "official views" have been adequately and capably presented by its counsel. Remand merely for the purpose of applying those views to Zeller's specific requests would simply delay final resolution of the dispute. In the interest of justice, and as a matter of the court's discretion, the request for remand to the ICC is denied.

## IV. PLAINTIFF'S CLAIMED RIGHT OF ACCESS TO ICC RECORDS

In response to plaintiff's request under the FOIA, the ICC has thus far turned over to plaintiff approximately 107 pages of material from its files. Invoking both the PA and FOIA, plaintiff seeks in Count II of the complaint to enjoin the ICC from continuing to withhold access to any remaining records in the ICC files that pertain to him. The undisclosed materials include some documents which the ICC contends should be withheld from plaintiff entirely, as well as certain deletions which have been made from the "final investigation report" that preceded the 1971 court proceeding against plaintiff.

Attached to defendants' motion papers is a certified copy of what is allegedly the ICC's complete file relating to the plaintiff. The file is divided into two "tabs": tab "A" consisting of records already disclosed to plaintiff and tab "B" consisting of records withheld from him. Pursuant to the authority granted by both the PA and the FOIA, the court has reviewed the tab "B" materials *in camera.* *See* PA(g)(3)(B); FOIA(a)(4)(B).

Plaintiff first raises a question as to whether all the ICC records pertinent to him have even been produced to the court. He argues that he applied for an ICC license in 1967, but that no records pertinent to that application have been mentioned or identified by defendants or produced to the court.

Despite plaintiff's assertions, however, materials pertaining to his 1967 license application are clearly contained in tab "A" of the ICC file. These materials include the application, Rec. at 186–191; a hearing examiner's recommendation denying the application, Rec. at 192–198; and a review by the ICC board members, Rec. at 200–206. Since plaintiff has raised no other claim of omission, there is no issue of fact with respect to the contents of the ICC file.

### A. *Access under the Privacy Act.*

Under the PA an individual is entitled upon request, to gain access to his record or to any information pertaining to him which is contained in the agency's system of records, PA(d)(1), but that right does not grant him access to "any information compiled in reasonable anticipation of a civil action or proceeding." PA(d)(5).

■ The government argues, correctly, that all of the information withheld from plaintiff falls within PA(d)(5) as having been "compiled" in reasonable anticipation of either the original injunction action against Zeller or of further enforcement proceedings against him after the consent injunction was granted. Apparently plaintiff, too, is satisfied that disclosure of the withheld materials is not required by the PA, since he has advanced no argument in that connection in his brief, but instead, claims a right to disclosure under the FOIA.

### B. *Access under the Freedom of Information Act.*

■ Generally speaking, the FOIA requires an agency to disclose on request information in its files which is not specifically exempt from disclosure by the statute. To qualify for exemption, the burden is upon the government to show that the withheld information falls within one of the nine categories described in FOIA(b). The information inspected *in camera* and collected as the tab "B" materials is divided into three parts which the government con-

tends exempt it from disclosure to plaintiff under FOIA(b)(5), FOIA(b)(7)(A) and FOIA(b)(7)(C), respectively.

FOIA(b)(5) exempts from disclosure "inter-agency or intra-agency memorandums [sic] or letters which would not be available by law to a party * * * in litigation with the agency." Under this exemption defendants seek to withhold the following:

1. Memorandum of Review dated May 26, 1971 from A/R/C Browning to Director Gould re: L & E 2–71–9 and 2–71–19.

2. Memorandum of February 19, 1971 from Assistant Regional Director LoRusso and District Supervisor Morrows re: acceptance of final investigation report and assignment of L & E no. 1A–71–23 and recommendation that action should be taken.

3. Memorandum of August 5, 1971, from Regional Counsel Walker to Regional Manager Abare requesting authorization of expenses for witness fees. (defendants also claim exemption under FOIA(b)(7)(C) to protect the privacy of the named witnesses).

As to each of the foregoing documents, defendants have met their burden of establishing the exemption. Each document is an intra-agency memorandum; each was prepared in connection with the injunction proceeding against Zeller which culminated in a pretrial consent judgment. Disclosure of the trial strategy, the evidence analysis and the witnesses that are revealed in these documents would be contrary to the protection Congress intended to afford such intra-agency memoranda by exemption 5.

FOIA(b)(7)(A) exempts from disclosure "investigatory records compiled for law enforcement purposes, but only to the extent that the production of such records would (A) interfere with [law] enforcement proceedings." The five documents listed in the government's memorandum of law in support of defendants' motion to dismiss at pages 44–45 are claimed to be investigatory records compiled for the purpose of determining whether Zeller was complying with the consent decree. Since that is a continuing injunction, and since there are continuing obligations upon Zeller arising out of statutory and regulatory requirements, defendants are not required to disclose the five listed documents even though no enforcement proceedings appear to be imminent.

Under FOIA(b)(7)(C) defendants seek to withhold still other investigatory records on the ground that their disclosure would constitute an invasion of privacy. Plaintiff's counsel has offered to accept those documents with appropriate deletions to protect the privacy rights of the individuals and firms named in them. With redaction to that extent, there would be no invasion of privacy, so the documents listed under exemption 7(C) on page 45 of the government's brief should be redacted and then turned over to plaintiff.

## V. PLAINTIFF'S PRIVACY ACT CLAIMS FOR RELIEF BASED ON THE ICC PRESS RELEASE

The complaint alleges that the ICC's press release about the consent injunction was not "accurate, complete, timely and relevant" within the meaning of PA(e)(5) & (6),[15] that its disclosure by Kampel under the authority of the ICC was willful and intentional under PA(g)(4), and that such disclosure was without plaintiff's consent and therefore violative of PA(b). Based

---

15. These sections of the Privacy Act require that

Each agency that maintains a system of records shall—

* * * * * *

(5) maintain all records which are used by the agency in making any determination about any individual with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the determination;

(6) prior to disseminating any record about an individual to any person other than an agency * * * make reasonable efforts to assure that such records are accurate, complete, timely, and relevant for agency purposes; * * * PA(e).

upon these allegations, plaintiff seeks *inter alia*, injunctive relief pursuant to PA(g)(2)(A) compelling amendment of the press release, and actual damages against the United States pursuant to PA(g)(4). Defendants seek to dismiss these Privacy Act claims based on the ICC press release on the ground that there has been no violation of the statute for which relief can be granted.

### A. *Injunctive relief.*

With respect to the claim that the press release is inaccurate and must be amended, plaintiff urges that the test for such a claim is not the newsworthiness or technical truth or untruth of the record, but whether, at the present time, the contents of the release are sufficiently accurate, complete, timely and relevant as to reasonably assure fair administrative treatment. Defendants argue that whether the standard is actual truth or reasonable assurance of fair administrative treatment, the press release as a matter of law is accurate, complete, timely and relevant.

There can be no question that the press release is a "record" within the terms of the Privacy Act, since it is an "item * * * of information about an individual that is maintained by an agency * * * and that contains his name * * *". PA(a)(4). Similarly, there is no question that the statements contained within the press release are factually accurate in all material respects. Any alleged deviation here from the statutory standard can arise only from inferences drawn from, or omissions from, the press release.

■ Commenting on the statutory requirement for accuracy in PA(e)(5), the Senate Report stated:

The standards of accuracy, completeness and timeliness, as well as relevancy are directed to the quality of the information in an individual's own file. The section thus looks to a double-pronged consideration, first to the authorized needs of the agency, and second, to the scope of the administrative need for information in order to make a decision on that individual. Sen.Rep.No.93–1183 *reprinted in* [1974] U.S.Code, Cong. & Admin.News 6916, 6965.

In addition, the OMB guidelines state that the language in PA(e)(5) conditioning accuracy on that which is reasonably necessary to assure fairness to the individual, "places the emphasis on assuring the quality of the record in terms of the use of the record in making decision affecting the rights, benefits, entitlements, or opportunities * * * of the individual." 40 Fed.Reg. 28948, 28964 (1975). Accuracy must therefore be considered here in terms of the manner in which the record is used by the agency to make decisions affecting the individual.

The OMB guidelines provide:

Agencies must limit their records to those elements of information which clearly bear on the determination(s) for which the records are intended to be used, and assure that all elements necessary to the determinations are present before the determination is made. 40 Fed.Reg. 28948, 28965 (1975).

■ The press release was initially issued as a means of providing information to the public, a legitimate function for the ICC. From its very nature it is a summary of a large body of information, much of which is a matter of record in the injunction proceeding itself. No adverse determination has been made on the basis of the press release. All that has happened with respect to plaintiff since its issuance has been the commencement of Kampel's investigation, an agency function which is authorized by statute and regulation. No official proceedings have taken place before the agency or in a court, nor has plaintiff alleged any official agency action that would operate as a "determination" adverse to any of plaintiff's rights, benefits or entitlements. It thus cannot be said that the press release has been used by the agency in making decisions adversely affecting the plaintiff. Its function was merely to serve as a non-exhaustive announcement of official proceedings. As long as the official proceedings have any relevance to agency activity, a press release about them, if accu-

rate when made, need not be altered at a later date. Accordingly, plaintiff's request for an injunction amending the press release must be denied, and defendants' dismissal motion, to the extent it is addressed to amendment of the press release, is granted.

### B. *Damages.*

Plaintiff also seeks damages resulting from defendants' disclosure of the press release allegedly in violation of PA(b). Since the Privacy Act did not become effective until September 27, 1975, the initial release of the press release and any disclosures of it prior to that date were not prohibited by the Act. After the effective date of the act, Kampel disseminated the press release to members of the public only once, on December 8, 1975. Prior to commencement of this suit defendants had voluntarily ceased all dissemination of the press release. Thus, the only incident of disclosure at issue here is the one which occurred at the ICC New York offices in late 1975 when Kampel showed the press release, as an object lesson, to two individuals who were seeking information about transportation brokers licenses.

PA(b) provides essentially that "absent the written consent of the individual, *any* disclosure of information covered by the Privacy Act is prohibited, unless authorized by one or more of eleven specific exceptions." *Local 2047 v. Defense General Supply Center,* 423 F.Supp. 481, 483 (E.D.Va. 1976) (emphasis in original).

■ Defendants argue that disclosure of the 1971 press release to the two individuals in December 1975 without Zeller's consent, was permissible under PA(b)(2) as a required disclosure under FOIA and under PA(b)(3) as a routine use. Neither claim requires dismissal. To qualify as a "routine use", the agency must notice such disclo-

sures in advance in the Federal Register. PA(e)(4)(D); *Harper v. United States,* 423 F.Supp. 192, 198 (D.S.C.1976). Absent any indication that the ICC had published such a notice, this defense is not available.

■ Plaintiff does not dispute that initially the press release, assuming its accuracy, was information properly released to the public. His complaint is against voluntary re-release, four years later, of stale information, on the theory, urged by defendants, that its disclosure is "required" by the FOIA.[16] However, nothing in the FOIA appears to require such information to be released in the absence of a request therefor.

■ To prevail on his claim for actual damages, plaintiff must show that "the agency acted in a manner which was intentional or willful". PA(g)(4). Whether Kampel's action in disclosing the press release in December 1975 was intentional or willful is a question of fact which cannot be disposed of summarily on the papers before the court. Accordingly, defendants' motion for summary judgment with respect to plaintiff's claim under the PA for damages resulting from disclosure of the press release to the individuals in December 1975 is denied.

### VI. PLAINTIFF'S CLAIMS UNDER THE FEDERAL TORT CLAIMS ACT

In the amendment to his complaint filed on April 30, 1976, plaintiff asserts two causes of action for damages under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346, 2671 *et seq.* The first alleges violation of the Privacy Act's prohibition against disclosure, PA(b); the second alleges the government's negligent failure to supervise Kampel. It is clear from the papers filed that plaintiff has timely presented his claims at the administrative level and exhausted the

---

**16.** Defendants also argue that distribution of the press release in December 1975 did not violate the Privacy Act because it dealt only with the business activities of plaintiff's proprietorships "Sol Zeller Tours", and "Executive Motor Tours" and therefore did not infringe Zeller's personal privacy. This argument, however, is only a disguised version of defendants' "entrepreneurial argument" discussed above in Part III-B of this decision, and is, therefore, rejected.

**504**

prerequisites to pursuing those claims in this court.[17] Defendants now seek to dismiss these two causes of action, arguing that plaintiff's remedy for improper disclosure of the press release is exclusively under the Privacy Act, not the FTCA, and that the claim of negligent failure to supervise is specifically exempted under the FTCA.

### A. Privacy Act Duty of Non-Disclosure.

In Part V of this decision, *supra*, the court has determined that plaintiff states a claim for relief based on the Privacy Act's non-disclosure provisions, due to the disclosure of the press release in December 1975. Plaintiff argues here that such an alleged violation of a statutory duty also states a claim for relief under the FTCA.

In relevant part, the FTCA provides that "[t]he United States shall be liable, respecting the provisions of this title relating to tort claims, *in the same manner and to the same extent as a private individual under like circumstances * * *."* 28 U.S.C. § 2674 (emphasis supplied). It further provides that

> the district courts * * * shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, * * * for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, *under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.* 28 U.S.C. § 1346(b) (emphasis supplied).

In construing this language, courts have held that when statutory duties of an allegedly negligent federal officer are rooted in federal law, the district court has no subject matter jurisdiction under the FTCA to consider a claim for violation of that duty. *Davis v. United States*, 395 F.Supp. 793 (D.Neb.1975) *aff'd* 536 F.2d 758 (C.A.8

1976); see also *Feres v. United States*, 340 U.S. 135, 141–42, 71 S.Ct. 153, 95 L.Ed. 152 (1950); *Zabala Clemente v. United States*, 567 F.2d 1140, 1149–50 (C.A.1 1977); *Mudlo v. United States*, 423 F.Supp. 1373, 1377 (W.D.Pa.1976); *Wheeldon v. United States*, 184 F.Supp. 81, 84–86 (N.D.Cal.1960).

*Feres v. United States, supra*, involved three actions for negligence under the FTCA, brought by or on behalf of servicemen who suffered injuries or death while in the course of military service. After reciting the statutory test for claims that may be cognizable under the FTCA, 28 U.S.C. § 2674, the Supreme Court noted that "this is not the creation of new causes of action but acceptance of liability under circumstances that would bring private liability into existence." *Feres v. United States, supra*, 340 U.S. at 141, 71 S.Ct. at 157. With respect to the claims asserted on behalf of the servicemen, the court stated:

> One obvious shortcoming in these claims is that plaintiffs can point to no liability of a "private individual" even remotely analogous to that which they are asserting against the United States. We know of no American law which ever has permitted a soldier to recover for negligence, against either his superior officers or the Government he is serving. Nor is there any liability "under like circumstances," for no private individual has power to conscript or mobilize a private army with such authorities over persons as the Government vests in echelons of command.
>
> * * * * * *
>
> [The FTCA's] effect is to waive immunity from recognized causes of action and was not to visit the Government with novel and unprecedented liabilities. *Id.* at 141–142, 71 S.Ct. at 157 (footnote omitted).

In *Davis v. United States, supra*, the complaint was based on the FTCA, alleging violation of a statutory duty through the negligence of an Occupational Safety and Health Administration compliance officer, which resulted in injury to the plaintiff. In its opinion, the district court stated:

---

17. See n. 8 *supra*, and accompanying text; 28 U.S.C. § 2671 *et seq.*

Two sources of duty arguably can be pointed to. One is the common law of Nebraska; the other, the Occupational Safety and Health Act of 1970, 29 U.S.C. §§ 651–678 (OSHA). However, the Federal Tort Claims Act specifically limits its application to those instances in which "the law of the place where the act or omission occurred" places liability upon the claimed wrongdoer. Unless the law of Nebraska would declare liability—including a duty—upon a private person in the same circumstances, no jurisdiction lies in this court.

I find no indication that any law permits Nebraska to place upon private persons the duties cast upon federal officers by OSHA. The Act's thrust is to require designated federal officers to investigate, issue citations, and apply for enforcement orders by a federal court. Nothing resembling those duties devolves on a private person under OSHA. *Id.,* 395 F.Supp. at 795.

The district court dismissed the complaint for lack of jurisdiction on its finding that the statutory duties required of OSHA officers are federally imposed, and had no counterparts cognizable under Nebraska state law, the "law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). The Eighth Circuit affirmed, stating that the district court's holding "is consistent with authority interpreting the scope of the Act to be limited to 'ordinary common-law tort' claims." *Id.,* 536 F.2d at 759.

■ In sum, "where specific behavior of federal employees is required by federal statute, liability to the beneficiaries of that statute may not be founded on the Federal Tort Claims Act if state law recognizes no comparable private liability." *Zabala Clemente v. United States, supra,* at 1149. See also *Baker v. F & F Investment Co.,* 489 F.2d 829, 835 (C.A.7 1973); *Devlin Lumber and Supply Corp. v. United States,* 488 F.2d 88 (C.A.4 1973); *United States v. Smith,* 324 F.2d 622, 624–25 (C.A.5 1963).

■ Applied here, even though the obligations and duties created by the Privacy Act bind federal agencies and their employees, see 5 U.S.C. § 552a(b), there is no law in New York placing upon private persons duties of non-disclosure such as those that the Privacy Act casts upon federal agencies. Consequently, Count VIII of plaintiff's complaint must be dismissed.

### B. *Negligent Failure to Supervise.*

The second amendment to plaintiff's complaint, designated Count IX, and also asserted under the FTCA, alleges that the government negligently failed to supervise Kampel so as to restrain him "from intentionally libeling, defaming and tortiously injuring plaintiff" and from disclosing the press release in violation of 49 U.S.C. § 322(d). Count IX also alleges the government's negligence in failing to prevent Kampel from disclosing the press release in violation of the Privacy Act. As a result, plaintiff claims damages for personal humiliation, mental anguish and suffering, as well as substantial damage to his name and personal and business reputation.

■ To the extent that Count IX seeks to recover for negligence in failing to prevent Kampel from violating the Privacy Act, the claim must fail. Since the underlying Privacy Act violation is not within the court's jurisdiction under the FTCA (see Part VI–A, *supra*) an allegation of negligent supervision to prevent that violation does not bring the claim within the FTCA.

■ Moreover, 28 U.S.C. § 2680(h) provides that the FTCA does not apply to any claim arising out of libel or slander. Even if Kampel's supervisors negligently failed to prevent his defaming the plaintiff, the claim, nonetheless, would still "arise out of * * * libel [or] slander" and thereby be excluded from FTCA coverage. Thus whether plaintiff's Count IX be viewed as a claim arising out of libel or one for violation of the Privacy Act, it cannot be maintained under the FTCA.

### VII. PERSONAL LIABILITY OF DEFENDANT KAMPEL

The complaint asserts two common law causes of action for damages against de-

fendant Kampel personally. The first, alleges that Kampel libelled plaintiff by distributing copies of the press release and that he slandered plaintiff by making defamatory statements contemporaneous with such distribution. The second, based upon a *prima facie* tort theory, alleges that in doing the acts which form the basis for the defamation claim Kampel "intentionally and maliciously injured plaintiff without lawful means and without * * * justification" and "solely for the purpose of harming plaintiff". Complaint ¶ 43.

In response, the government argues on its motion for summary judgment that Kampel was at all times acting within the scope or outer perimeter of his official duties and is, therefore, entitled to a defense of absolute immunity from liability for damages, relying on *Barr v. Matteo*, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959). Alternatively, the government asserts that Kampel is at least entitled to qualified immunity based upon his good faith, reasonable belief that he was properly acting within the scope of his official duties.

Plaintiff urges that *Barr v. Matteo's* doctrine of absolute immunity is no longer valid in light of more recent decisions holding that officers of the executive branch of government are entitled only to a qualified immunity based upon reasonable grounds and the good faith belief of the individuals seeking such protection. These cases include constitutional tort claims against federal officers, *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978); *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), on remand, 456 F.2d 1339 (C.A.2 1972), and civil rights damage suits against state officers under 42 U.S.C. § 1983, *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).[18]

The court need not decide the question of immunity at this juncture, however, in light of its determinations that plaintiff's only viable claim in this federal action is one for damages against the United States under the Privacy Act, based on Kampel's dissemination of the press release to the two individuals who visited the ICC offices in December 1975. (*Supra*, Part V–B) The court might be barred altogether from considering the two causes of action against Kampel based on state common law, because as the result of this decision Kampel is in effect, a "pendent party." See *Aldinger v. Howard*, 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976); *Astor-Honor, Inc. v. Grosset & Dunlap, Inc.*, 441 F.2d 627, 629–30 (C.A.2 1971); *Maltais v. United States*, 439 F.Supp. 540, 546–49 (N.D.N.Y.1977); *Vargas v. Correa*, 416 F.Supp. 266, 269–70 (S.D.N.Y.1976). Since neither party to this action has raised or briefed the issue of the court's jurisdiction over Kampel as a "pendent party", the issue will be reserved for discussion at a subsequent status conference. Then, if necessary, the immunity issue will be determined.

## SUMMARY AND CONCLUSIONS

1. Plaintiff has stated in Count I a claim for damages under PA(g)(4).

2. Under Count II plaintiff is entitled to disclosure of the following documents:

A. Memorandum of August 5, 1971, from Regional Counsel Walker to Regional Manager Abare requesting authorization to expenses for witness fees and naming the witnesses.

B. Final investigative report (BOp 26 No. 1A–71–23 L & E 2–71–9–2/16/17. Deletions of names have been made in the following pages: 7, 8, 10, 11, 12, 13, 14, 16, 17, 20, 21 and 22.

C. Abstracts of trips. References to any consignor under headings of Record of Payment and Other Records have been deleted.

---

18. As noted by the defendants, no constitutional tort claims or § 1983 civil rights claims are raised in this action.

3. Decision is reserved on the motion to dismiss Counts IV and VI, pending a status conference and argument concerning the problem of pendent party jurisdiction.

4. In all other respects the complaint shall be dismissed.

Counsel shall attend a status conference on Tuesday, April 24, 1979 at 9:00 a. m. to discuss the pendent party jurisdictional problem and the future course of this action.

SO ORDERED.